UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ARTHUR GENASCI, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 4:06CV542 CDP |
|  | ) |  |
| THE CITY OF O'FALLON, | ) |  |
| MISSOURI, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## MEMORANDUM AND ORDER

Plaintiff Arthur Genasci was employed by the City of O'Fallon as the Director of Building Safety from July 2004 until December 27, 2005. After he was fired in December 2005, Genasci filed this suit alleging first amendment retaliation and conspiracy to deprive him of his constitutional rights under 42 U.S.C. § 1983. He also brings two state-law wrongful discharge claims and a count for defamation. Because Genasci's speech was made according to his "official responsibilities" it is not protected by the first amendment, and defendants are entitled to summary judgment on his federal claims. Additionally, all of the individual defendants are entitled to summary judgment on Genasci's wrongful discharge claims, and O'Fallon is entitled to summary judgment on one of those claims. Still, issues of fact preclude summary judgment against O'Fallon

on the other state-law wrongful termination claim, and I will exercise supplemental jurisdiction over Genasci's remaining state law claims even though I am dismissing the federal claims.

**<u>Undisputed Facts</u>**

Genasci was hired by the City of O'Fallon as a commercial building inspector in 2002, and he was promoted to Director of Building Safety in July 2004. As the Director of Building Safety, Genasci was responsible for overseeing the building division and code enforcement division of O'Fallon. Among other things, his job duties included formulating "original policies and procedures for the Building Division assuring for accuracy, fairness, and complaince with laws and rules" and preparing and administering "the budget for the Building Division assuring for appropriate use of allotted funds."

In 2004, O'Fallon's Finance Director asked Genasci about increasing the building permit fee charged by Genasci's department, and Genasci told her that because the department's revenues already exceeded its expenses any increase required a vote of the citizens. This is because Missouri's Hancock Amendment requires a vote if a political subdivision wishes to raises taxes or increase user fees above actual costs. In 2005, he was again asked to look into increasing permit fees for the 2006 budget. Genasci again reported that the department's revenues

exceeded its expenses. Genasci discussed the excess building permit fees and his fear that the O'Fallon might violate the Hancock Amendment with various city officials. Specifically, Genasci's discussion of this issue is apparent in the following documents: (1) a December 2004 budget report, (2) a June 2005 Mid-Year Budget Adjustment report, (3) a July 2005 memorandum prepared at the request of the City Administrator, (4) a July 2005 report by the City Attorney, Mark Piontek, indicating that he spoke with Genasci about his department's expenses and revenue, (5) an August 2005 e-mail exchange where Genasci discussed whether he was prepared to justify the proposed fee increase to the Board of Alderman, (6) an October 2005 memorandum discussing budget concerns and following up on previous conversations Genasci had with the Mayor, defendant Donna Morrow, and the new City Administrator, defendant Robert Lowery Jr., and (7) a visual aid used by Genasci in an October 2005 presentation to the Board of Alderman concerning Genasci's analysis of his department's proposed budget.

As noted above, Genasci and Piontek had discussed the revenue and expenses of Genasci's department. After this discussion, Piontek cautioned city officials that increasing building permit fees might violate the Hancock Amendment, and he advised the city that it needed to ensure that the proposed

building permit fee increases were justified by the costs associated with running the building safety department. Ultimately, the building permit fees were not increased in 2005 or 2006, and the city decided to hire additional staff and purchase additional equipment for that department.

Meanwhile, in 2004, building code enforcement officers cited a private contractor for grading requirement violations of the city's building code. The building safety department had previously issued a final inspection approval two years before the citation was issued, and the final inspection stated that the yard had to be in place within 60 days but did not provide any other details regarding grading requirements. The homeowner, the contractor, and the city attempted to resolve the matter, and on December 27, 2005, Genasci was asked to sign a settlement agreement, which he refused to do. This agreement provided that the contractor would pay $3750.00 into an escrow account to be used to get the home into compliance with city codes. The city had previously sent the contractor two estimates for the cost of repair, one for $5,100 and one for $8,366.20. The city ultimately dismissed the charges against the contractor because the city's prosecuting attorney did not believe he could prove the ordinance violation.

On December 27, 2005, Genasci was terminated from his employment with O'Fallon. Defendants Richard Fischer and Lowery were involved in the decision

to terminate Genasci. Genasci appealed the decision to terminate his employment to O'Fallon's Personnel Board. The Personnel Board was made up of defendants Morrow, Peter Cantwell, Bill Hennessy, Bill Gardner, Daniel Christoff, John Haman, Jr., Jeff Schwentker, Pierce Conley, and Rick Lucas. The Personnel Board issued its findings of fact and conclusions of law affirming the decision to terminate Genasci's employment.

## Discussion

In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*,

477 U.S. at 323.

   1.   First Amendment Retaliation

To establish a prima facie case of First Amendment retaliation, Genasci must allege and prove that: (1) he engaged in an activity protected by the First Amendment, (2) the defendants took an adverse employment action against him, and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action. *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007) (citing *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 (1977). If Genasci meets his burden, the burden shifts to defendants to "demonstrate that the same employment action would have been taken in the absence of the protected activity." Id.

To determine whether Genasci's speech is protected by the First Amendment, I must initially decide whether Genasci "spoke as a citizen on a matter of public concern." *McGee v. Public Water Supply*, 471 F.3d 918, 920 (8th Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006)). This issue is a question of law for me to decide.[1] *Id*. If Genasci spoke about a matter of public

---

[1]Genasci argues that defendants have failed to prove that no genuine issue of fact exists with respect to the issue of whether his speech was within his official employment duties. For the purposes of this motion, defendants do not dispute the underlying factual allegations concerning Genasci's speech: what was said, when the speech was made, or to whom the speech was made. Rather, defendants raise the *legal* question of whether the speech was within his official employment duties.

concern, but did so in the course of his ordinary duties as a government employee, he was not speaking as a citizen and his speech is not protected by the First Amendment. *Id*. at 921. In determining the scope of Genasci's duties, I should focus on the duties he was expected to perform, "rather than his formal job description." *Id*. The First Amendment does not protect speech that "owes it existence" to the employee's professional responsibilities. *Id*. Defendants argue that Genasci's speech was made within the scope of his duties, and I agree.

Genasci alleges that he is entitled to First Amendment protection for his statements that the city's use of permit fees collected by the Building Safety Division for other purposes was a violation of Missouri's Hancock Amendment, his statements that the city had generated a surplus in permit fees of over $3 million over the past seven years, and his refusal to sign a final inspection/settlement agreement.[2] Genasci was the Director of the Building and Safety department of O'Fallon. Genasci submitted a copy of his official job description. It states that his duties included overseeing the building division and the code enforcement division of O'Fallon. Additionally, it encompassed

---

[2]To the extent that Genasci's refusal to sign can be regarded as speech, this last argument is legally frivolous. His own evidence establishes that he was being asked to sign the settlement agreement on behalf of O'Fallon in his capacity as Director of Building Safety, so there can be no doubt this instance was part of his ordinary duties.

formulating "original policies and procedures for the Building Division assuring for accuracy, fairness, and compliance with laws and rules," and preparing and administering "the budget for the Building Division assuring for appropriate use of allotted funds."

Genasci compares this situation to the facts in *Lindsey v. City of Orrick, Missouri*, 491 F.3d 892, 897-898 (8th Cir. 2007). In that case, the plaintiff was employed as the public works director, and his job duties included park, water, sewer, and street maintenance, as well as supervising employees in those areas. Lindsey spoke out repeatedly about his belief that the city was violating Missouri's "sunshine" law but had been told that "the sunshine laws were none of his business." Even after being told that the "sunshine" laws were not his concern, he continued to speak out regarding his belief that the city's actions were illegal. Lindsey's case was allowed to proceed because ensuring compliance with sunshine laws was not part of his job duties.

This case is more closely related to *McGee v. Public Water Supply Dist. #2 of Jefferson County, Missouri*, 471 F.3d 918, 919-21 (8th Cir. 2006). In that case, McGee was employed as the District Manager for a public water supply district and his speech involved environmental compliance during the repair of a septic tank and the relocation of a water pipe. He attempted to argue that the speech was

outside his professional responsibilities because he had been removed from the water pipe removal project and told not to concern himself with the septic tank problem. Regardless, the Eighth Circuit found that "the projects clearly fell within both McGee's overall supervisory duties as District Manager and his admitted duty to advise the Board regarding regulatory and legal requirements." *Id.* at 921.

The evidence clearly establishes that Genasci's speech concerning the budget surplus and the Hancock amendment fell within his professional responsibilities. Both budgetary issues and departmental legal compliance are specifically referenced in his job description. Even if his speech did not directly fall into one of the categories described in his job description, which I believe it does, his speech clearly "owed its existence" to his professional responsibilities. All of the documents Genasci submitted regarding his speech establish that his statements regarding the budget surplus and Hancock amendment were made in departmental reports or in response to email discussions with supervisors in the context of determining whether he was prepared to justify his department's proposed fees to the Board of Alderman. As a result, I will grant defendants' motion for summary judgment with regard to Genasci's First Amendment retaliation claim.

In so ruling, I am not stating that Genasci's statements were not of public

concern. Instead, I am following the law as recognized in the Supreme Court's decision in *Garcetti*, where the Court stated, "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." 547 U.S. at 421-22. Although Genasci's speech may have been on a matter of public concern, it was speech within his official duties, and therefore, not protected by the First Amendment.

    2.    <u>Conspiracy Claim under 42 U.S.C. § 1983</u>

In order to prove his § 1983 conspiracy claim, Genasci must show: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). Additionally, Genasci must "prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.* The only allegations in Genasci's complaint concerning a deprivation of his constitutional rights relate to his First Amendment claim. Because I have held that defendants are entitled to summary judgment on that claim, defendants are also entitled to summary judgment on Genasci's civil

conspiracy claim. *See Askew v. Millerd*, 191 F.3d 953, 957-59 (8th Cir. 1999).

3. <u>Wrongful Termination</u>

In counts III and IV of his complaint, Genasci brings state-law claims of wrongful termination against all of the defendants. Although generally under Missouri law an employee who does not have a contract is an employee at will and may be discharged at any time, Missouri recognizes a common-law exception to the employment at-will doctrine where an employee can prove that he was discharged because (1) he refused to perform an illegal act or an act contrary to a strong mandate of public policy; (2) he reported serious misconduct that constitutes a violation of the law, or of well established and clearly mandated public policy, to his superiors or third parties; (3) he acted in manner public policy would encourage; or (4) he filed a worker's compensation claim. *Dunn v. Enterprise Rent-a-car Co.*, 170 S.W.3d 1, 6 (Mo. Ct. App. 2006). Two recent opinions in this district have addressed these exceptions to the employment-at-will doctrine in cases involving some of the same defendants and similar factual allegations. *See Criswell v. City of O'Fallon, Mo*, 2007 WL 1760744, at \*6 (E.D. Mo. June 15, 2007); *see also Mobley v. City of O'Fallon*, Case No. 4:06CV1566

JCH (E.D. Mo. March 30, 2007).³ As in those cases, Genasci's wrongful termination claims are only available against his "actual former employer, i.e., the City of O'Fallon." *Id.* Genasci's claims can only proceed against the City of O'Fallon, and his wrongful discharge claims against the other individual defendants must be dismissed.

In this case, Genasci asserts that two of his actions are covered by the whistleblower protections: his reports to his supervisor and other city officials that the City was collecting and retaining excess Building Department fees as general revenue in violation of the Hancock Amendment and his refusal to sign an agreement that he believed violated the City's building codes or the public policy evidenced in the building codes.

With regard to Genasci's first argument, defendants argue that Genasci cannot establish that O'Fallon's collection of fees violated the Hancock Amendment, Mo. Const., Art. X §§ 16-24. The Hancock Amendment prohibits a political subdivision "from increasing the current levy of an existing tax, license, or fees . . . without the approval of the required majority of qualified voters." *Building Owners & Managers Ass'n of Greater Kansas City v. City of Kansas*

---

³Genasci sued two additional defendants that Criswell and Mobley did not sue, and Criswell and Mobley sued one additional defendant that Genasci did not sue. Otherwise, the defendants are identical in the three cases.

*City*, 231 S.W.3d 208, 211 (Mo. Ct. App. 2007) (citation omitted). User fees are not covered by the Hancock amendment if they are fees charged for the provision of goods or services to an individual, are only charged to those individuals who use that good or service, and are dependent on the level of goods or services provided to the fee payer. *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 304 n.10 (Mo. 1991) (applying a five-factor test to determine whether a fee is covered by the Hancock Amendment). Additionally, if the fee increase would exceed the cost of the service, the excess is governed by the Hancock Amendment. *Brooks v. State of Missouri*, 128 S.W.3d 844, 850 (Mo. 2004).

In 2004 and 2005, O'Fallon was considering increasing its permit and plan review fees. At both of these times, Genasci indicated that his department's revenues exceeded its expenses, and in July 2005, Genasci prepared a memorandum, stating that the proposed increases would have generated approximately $430,000.00 in excess revenue. The fees were not increased in either 2005 or 2006. Neither party has presented any evidence concerning O'Fallon's previous permit and plan review fee increases or any evidence concerning O'Fallon's expenses at the time of the previous increases. As a result, Genasci offers no argument that O'Fallon violated the Hancock amendment when it previously raised the fees for his department. Instead, he argues that the

proposed fee increases would have been illegal.  Defendants argue that because

Genasci does not have an expert witness to support his argument, Genasci cannot

establish that the fee increase was illegal.  They also argue that because the fee

increase did not happen in 2005 or 2006 and because O'Fallon increased the

expenses in Genasci's department, he cannot establish illegality, and his claim

must fail.  I disagree.

The Missouri Court of Appeals' has indicated that where an employee is

"instrumental in helping prevent what he reasonably believed to be an unlawful

act, he should be protected by the law for his efforts." *Dunn*, 170 S.W.3d at 9.

"Public policy would certainly not be served by requiring an employee to wait

until his or her employer completes the unlawful act before reporting it and before

being protected by the whistleblower exception to the employment at-will

doctrine." *Id.* at 10.  In *Dunn*, the former employee had reported to his supervisor

that he believed that the company, Enterprise, risked violating federal law if it

calculated depreciation rates in a manner he believed violated generally accepted

accounting practices.  Ultimately, Enterprise postponed its initial public offering,

at least in part, because of Dunn's statements.   As a result, Enterprise never

actually violated any law.  *Id.* at 5-7.  The court reversed the circuit court's

decision granting judgment notwithstanding the verdict.  The court held that in

order to state a wrongful discharge claim for reporting unlawful conduct, a plaintiff is required to identify a law or clear mandate of public policy he believed his employer violated or *would* violate. *Id.* at 11; *see also Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 849 (Mo. Ct. App. 2007).

In this case, Genasci reasonably believed that the proposed fee increases would violate the Hancock Amendment. In July 2005, the city's attorney, Mark C. Piontek, drafted a memorandum that referred to the proposed fee increase in Genasci's department and indicated:

> Art has indicated to you in a July 8, 2005 Memorandum that these proposed increases will generate approximately $430,000.00 more in revenue than expenses. Based on this it is my opinion that, either a reexamination of the costs of providing these services is done to assure that all costs are being accounted for, or that the proposed fees be reduced to a level that reasonably approximates the cost of providing the services. As currently proposed I think Hancock is triggered and these proposed fee increases require voter approval.

A jury could find that based upon this legal opinion, Genasci reasonably believed that the proposed fee increase would violate the Hancock Amendment when he spoke to his supervisors regarding his concerns. Defendants have not raised any argument concerning the other elements of Genasci's whistleblowing claim. As a result, I will deny the City of O'Fallon's motion for summary judgment on the whistleblowing claim.

On the other hand, I will grant O'Fallon's motion for summary judgment with regard to Count IV, Genasci's claim that he was discharged for his refusal to sign the settlement documents. Genasci alleges that this claim falls under the refusal to perform an act that would violate law or public policy exception to the employment-at-will doctrine. In order to state a wrongful discharge claim under this exception, Genasci must "show that there is 'some legal authority for his belief that' the conduct in which he allegedly refused to engage 'was unlawful or contrary to a clear mandate of public policy.'" *Hess v. Sanofi-Synthelabo Inc.*, 503 F. Supp. 2d 1178, 1187 (E.D. Mo. 2007) (quoting *Dunn*, 170 S.W. 3d at 11).

Genasci argues that he believed that signing the settlement agreement would have been illegal or against the public policy of O'Fallon because it would have left the city or the home owner responsible for costs of remedying the problems caused by the builder's failure to comply with the building code. Genasci's testimony establishes that he did not sign the agreement because it allowed the contractor to settle the dispute for $3750, instead of the $5000 that Genasci believe was the proper settlement amount. Genasci testified that he would have signed the settlement agreement if the amount had been correct.

Genasci does not state what law would have been violated if he had signed the settlement agreement, nor does he specify any public policy that he might have

reasonably believed would have been violated by settling the claims against the contractor. Missouri public policy favors settlements of disputed claims. *State ex rel. State Highway Comm'n v. Sheets*, 483 S.W.2d 783, 785 (Mo. Ct. App. 1972). Disputed claims are often settled for less than full value, and the claim against the contractor was under dispute. While Genasci might have believed that the homeowner or city would not have been fully compensated by the agreement, this belief does not establish a reasonable belief that signing the agreement would have violated the law or public policy of O'Fallon. As a result, I will grant O'Fallon's motion for summary judgment on Count VI.

4. <u>Supplemental Jurisdiction over the Remaining State-Law Claims</u>

Defendants argue that I should refuse to exercise supplemental jurisdiction over the defamation claim and dismiss that claim without prejudice because I am dismissing Genasci's federal claims.[4] Under 28 U.S.C. § 1367(c), I may decline to exercise supplemental jurisdiction over the state-law claims where all of the federal claims have been dismissed. My determination of whether I should retain jurisdiction over the state claims requires consideration of "judicial economy, convenience and fairness to the litigants." *Pioneer Hi-Bred Intern. v. Holden*

---

[4]Because I am denying summary judgment on Genasci's whistleblower claim as well, I assume that defendants believe that I should also refuse to exercise supplemental jurisdiction over that claim.

*Found. Seeds, Inc.*, 35 F.3d 1226, 1242 (8th Cir. 1994). "It is the law in this circuit that the substantial investment of judicial time and resources in the case justifies the exercise of jurisdiction over the state claims, even after the federal claims have been dismissed." *Id.* This case was filed in March 2006 and is set for trial in approximately one month. The interests of justice favor retaining jurisdiction where, as here, the claims do not raise novel issues of state law, the case has been pending for more than two years, the federal claims have been dismissed at the summary judgment stage, and the trial date is rapidly approaching. *See Krambeck v. Children and Families of Iowa*, 451 F. Supp. 2d 1037, 1044 (S.D. Iowa 2006).

Therefore, I will retain supplemental jurisdiction over Genasci's state law claims. Count III remains for trial against the City of O'Fallon only, and Count V, on which summary judgment was not sought, remains for trial against defendants Lowrey and Fischer. These claims remain set for trial on the September 8, 2008 trial docket.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#95] is granted in part and denied in part. Count I, Count II, and Count IV are dismissed in their entirety. Count III is dismissed against the individual

defendants only. Count III remains pending against the City of O'Fallon and Count V remains pending against defendant Fischer and Lowrey.

**IT IS FURTHER ORDERED** that the parties are reminded that the case is expected to be reached on the two-week docket beginning **September 8, 2008** and their pretrial submissions are due on or before **August 19, 2008**.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of August, 2008.